May you please record. Good afternoon. Hold on just a moment. I'm just going to give them an opportunity. Alright, you may proceed. Thank you. May you please record. Good afternoon. My name is Rebecca Chavez, and I represent Petitioner José Ricardo Fuentes-Pineda. I would like to reserve three minutes for rebuttal. There are two independent grounds that warrant a rebuttal. First, the immigration judge applied the wrong legal standards by bifurcating past torture and current country conditions, and in doing so, failed to evaluate Mr. Fuentes-Pineda's personal risk of torture. Second, the immigration judge failed to make the legally required findings as to whether the Salvadoran government is intentionally creating and ensuring life-threatening prison conditions with the intent to inflict torture. I will address each in turn. At its core, this case is about personalized risk of torture. Mr. Fuentes-Pineda is someone that the Salvadoran government has specifically singled out, tortured, and threatened with death. Yes, the immigration judge ignored his claim and the very real risk that he would be singled out for torture. The Convention Against Torture regulations are very clear. It must be a forward-looking, individualized effort. This means the immigration judge must look at past torture, current country conditions, and all relevant factors together in the context of the individual's personal history and circumstances. And here, the immigration judge compartmentalized that analysis in a way that undermines that requirement. As shown in 1139 of the record, the immigration judge first looked at Mr. Fuentes-Pineda's past torture, separately, and determined that his past torture alone did not meet the requisite likelihood of torture. Then he additionally, separately, looked at the current country conditions and found that those alone did not establish the requisite likelihood of torture. The word additionally, which is the exact word that the immigration judge used, highlights the problem. He looked at past torture as his own isolated factor and current country conditions as a separate factor, rather than looking at how the two interact to inform risk. This is evident when we look at how he reviewed the past torture, only in the context of past conditions and past experiences. The immigration judge relied on Mr. Fuentes-Pineda's prison experience from 2011 to 2018, noting that he hadn't been tortured then. However, this ignores everything that has happened since 2018 and what forms the basis of Mr. Fuentes-Pineda's case. Importantly, it ignores the change in administration in 2019, the torture he suffered in 2020 and 2021, and the worsening prison conditions and increase in human rights abuses in El Salvador since March of 2022. Looking backwards like this fails to connect the dots between past torture and the current country conditions and is not a proper forward-looking assessment. And we see this compartmentalization continue when the judge does finally turn to the current country conditions. When the immigration judge evaluated Mr. Fuentes-Pineda's risk of torture and detention, he stopped looking at Mr. Fuentes-Pineda's personal risk factors. He stopped looking at past torture. He stopped looking at his... Counsel, I guess I'm trying to understand the argument. When you're conceding that he examined it, but then you say he compartmentalized it and didn't consider it when he considered the next factor? Yes, Your Honor. I mean, he just talked about it. The order, the opinion is very detailed. And it goes over all these factors. So I guess I'm trying to understand what you mean when you say he stopped considering something that he made an observation about, commented on it, included it in the opinion, but then didn't consider it? What do you mean? Yes, I do concede that he did make a finding at the past torture. The immigration judge didn't do that. However, he didn't do it in the context of what is likely to happen in the future, meaning the country's conditions. And what is important, the point I'm getting to, is that he didn't make the direct finding as to whether Mr. Fuentes-Pineda would be singled out specifically even after being detained. If you see the immigration judge, after he made the finding that he was going to be detained, he only focused on general prison conditions and never engaged with the theory that Mr. Fuentes-Pineda would be personally targeted for torture even after being detained. Well, he acknowledged that as a gang member he was going to be, he was going to get some special attention because of this state of exception. So he acknowledged that. Yes, that is correct. He did acknowledge that. However, even after he's detained, the inquiry doesn't stop there and his personal risk factors don't stop there. And he isn't, just because he is also within the group of people detained under the state of exception, there are very different people that are being detained under the state of exception. Not all of them have been tortured in the past. Not all of them have gang-affiliated tattoos. In fact, the record shows that upon admission, they categorized the individuals as either civilians, tattooed civilians, active members, or retired members. And that is in the record at 606. And even among the gang members, there's further classification. There is aspiring, active, and gang leaders. Gang leaders are comprised of 1.7 percent. So he is still very much identifiable even within the prison itself. And that is something that the judge didn't engage with. And I find that this is very similar to an alternative. But you've got to go beyond identifiable. You've got to get all the way to likely to be tortured. And that's what the judge didn't engage with. He didn't even get there. That's the problem. He didn't engage to see if he would be personally singled out. Once he mentioned that he was going to be in detention, he only treated this as a general prison condition. Jeez, that is not what this is. Well, respectfully, I'm not sure you're engaging with the IJA's opinion in full. I think just to quote two of the relevant sentences, it is too speculative to find that the same officers who tortured Respondent will also be involved in his future arrests. The court also observes that Respondent was not tortured when he was previously in prison. And it goes on and on. I mean, this is a pretty detailed opinion. So what are you saying, that they are not even engaging in the material? That's what I'm not saying. And again, with that statement the judge made, again, it was backward looking. He's focusing on detention conditions then, and he's also focusing on the realm of actors. He's acknowledged that the actors who are going to torture him, or likely torture him, would be the sovereign government, the state. So this is not a specific officer that is holding some kind of animosity towards him. There's more than 30 officers that he engaged with during this time. So it would be erroneous for him to totally rely on these specific officers when there is nothing to suggest that only specific officers are actors. Well, what specific evidence in the record sufficiently establishes that the Salvadoran government deliberately intends to torture its prisoners? It should be a deliberate intention. As you can imagine, the government is not going to outright say that we are intending to do that. But the evidence that is in the record would be the lack of oversight, meaning that they are not allowing human rights organizations or oversight in the prison conditions. That's found in multiple sites in the record at 497, 736, 740, and 771. Statements from high-ranking officials, including the president himself, indicating that this is appropriate treatment for gang members. This is at 291 and 541 of the record. And also, what's important to look at is how are they using their resources? If you see the notorious medical prison, CCOT, it was made with intentional overcrowding. That also can suggest an intent, and there's also restrictions to access to information. The only reason that we have any kind of information about the deaths in custody or what is going on is to outsize reporters like Christa Fell and Amnesty International. But the government itself is not allowing this information to be publicly accessed. So there's a lack of transparency. So this can all point to intent. There's nothing specifically, but this is all— And that can all point to an intent to do what? An intent to inflate torture. But that is more the— Lack of sharing information about conditions inside the prison. Yes, and that is what the Board of Immigration Appeals has held in matter of JE, that that is a relevant factor. So that is a relevant factor to intent. Lack of sharing information kind of suggests that they do not want people to know what is going on within the prison. And as well as the immigration judge has noted, there's mass graves. But I want to get back to the point that I was making as far as that the judge didn't consider that this was an individualized claim. Meaning, after he was in detention, there was an alternative theory that Mr. Francisco Inegas would be singled out for torture. And that goes in line with cases of the Fifth Circuit in Garcia v. Holder, a 2014 case. And Inegas filed a case, a 2017 case, where this court has held that the Convention Against Torture requires the adjudicator to consider all alternative theories. And that is an alternative theory that the judge did not engage with here, whether he would be personally singled out for torture even after being detained. And I would like to briefly turn to the second error in the immigration judge's position concerning his analysis of the prison conditions as to specific intent. We did kind of already touch on what intent entails and how to ascertain intent. But here the immigration judge didn't make that finding as to the prison conditions. He devoted a single sentence at 1139 to the question of whether prison conditions themselves could constitute torture. And he acknowledged that they are poor, life-threatening conditions, overcrowding, lack of access to food, medical care. But he dismissed them as not necessary torture without explanation and without making a finding as to whether the government is intentionally creating and maintaining these conditions to inflict severe physical or mental suffering. And back to the case matter of J.E., in that case, it was a prison condition case for Haitian prisons. But the court did not state that prison conditions can never be torturous. It's the intent that can convert abusive prison conditions to torture. And that is what the judge didn't do. He did not make that specific intent finding as to the prison conditions. I do want to acknowledge that he does cite specific intent on page 164 of the record. However, he applies it too narrowly. He is solely focusing on whether the death in prison is specifically intended. And that is not the question. The question is whether the prison conditions themselves are inflicted to—they are intentionally caused with the intent to inflict severe pain or suffering. And that can be mental or physical. And while the judge focused on death, death is the end-all, be-all form of torture. But that is not all that torture can be. And so the judge did not make that finding here. And even when the judge is considering the deaths, he himself notes that they could be the product of overcrowding. But he never indicated whether the overcrowding was specifically intended. And his analysis to those specific deaths is also flawed, because he did not consider a very key piece of evidence found at Annex I of the Priestle-Style Report, which documents and has data as to the causes of death. There's 153 deaths that have occurred under the control—in prisons under the control by the state. He summarily found that there was a strong possibility that they were negligent, but he didn't engage with a very strong piece of evidence. In this court, in Arteta, Hernandez, and again, Aguilar, Quintanilla, and Midiphon v. Garland have indicated that if the adjudicator does not address the key piece of evidence, the matter should be remanded. And it's further—it's clear that he didn't engage with it, because he cites 132 deaths. If he looked at the annex itself, there was 153 deaths. The names listed out are the causes, the conditions of their bodies. So it's unclear to me how he could reach a finding of negligence without even relying on or looking at a key piece of evidence. And for those reasons, the immigration judge's specific intent finding is legally insufficient, because he never made a finding as to whether the conditions themselves are intentionally created or maintained in order to explain his torture. Even when you talk about conditions, what specifically are you talking about? Overcrowding? Lack of food? Yes, I'm citing the extreme overcrowding, the unsanitary conditions, withholding of food, lack of water, lack of access to medical care, extreme humiliation, physical punishment, routine violence and verbal abuse, which are all factual findings that the immigration judge did make to the conditions themselves. But he didn't find whether they were intentionally created or maintained. He did acknowledge that they were life-threatening. And life-threatening, as I previously mentioned, they can be tortured if there's an intent to inflict those conditions. And when we're looking at intent, we need to engage with the record, which includes how are they allowed, are they allowed others in to monitor, what are they believing about it, what kind of statements are they making to the public. That all goes to intent. So for those reasons, we would request that the court remand the case so that the judge is allowed to make a factual finding as to the independent theory that Mr. Fuentes-Pinera personally singled out for torture in detention, and secondly, to make a finding as to whether the Salvadorian government is intentionally creating and maintaining these conditions. Prison conditions in order to inflict torture. Thank you. Thank you, counsel. May it please the court, Christopher Pryby for the attorney general. Neither of the petitioners to central disputes will succeed. They are, the agency considered all the relevant evidence in the record, and the agency's factual findings are supported by substantial evidence in the record. Not every reasonable fact finder is compelled to disagree with the agency. Petitioner's arguments are primarily about the weight of the evidence and what could have been the case, not what is compelled by the record. The government stands on its knees, but I do want to make a few specific points in rebuttal to what was just presented by opposing counsel. I'm not sure, I haven't had a chance to review their opening brief in detail, but this is the first time I believe I have heard about a failure to consider an independent theory about being personally singled out for torture. So I am not sure that that argument is properly before the court for adjudication. Similarly, this was raised in their reply brief for the first time. The failure to consider international oversight and intervention was argued as reversible error. And again, that was not raised in their opening brief. I was able to find it. This is also, I think, the first time that has been the number of deaths that was cited by the IJ was wrong. I don't know that that was cited in the opening brief as well. Similarly, for talking about the various classifications of gang members. So, in other words, the government essentially stands on its knees. If this court has any further questions, I am happy to answer them. What would need to be factually correct for this defendant to secure cat relief? What would he have to prove? What would have to be established? He would have to establish either a specific intent to create, or a specific intent through the conditions of confinement to cause extreme pain and suffering, or he would have to prove that... And what facts would support that? What facts would support that? Yeah. Well, he would need to show that the record compels, in fact, that finding. And here the record doesn't compel that finding because... I mean... I guess I'm not sure about the question. Are you asking me to make the argument for what petitioner's argument would need to be? Right, on behalf of the government. Well, what facts would be established that you would... I mean... That the defendant would be able to prove enough to secure cat relief? I guess if President Cayla came out and said, I am specifically intending to torture and cause extreme pain and suffering to every gang member incarcerated in El Salvador, perhaps that would be enough to get that specific intent wrong. But that's not what we have here. We have moral condemnation. We have, say, gang members deserve poor treatment, but that's not enough. That doesn't show specific intent to cause extreme pain and suffering. But he has... He's demonstrated that he's been tortured in the past. Yes. And that torture was done by officials, government officials. That's what the immigration judge found, yes. And this state of exception exists because they're targeting gang members. That's correct, Your Honor. All right. And he has gang tattoos and admits to having been a member of a gang. Yes, Your Honor. All right. And he's going to be in the custody of government officials. That's what was found, yes. And it's government officials who tortured him in the past. It was... Government officials did torture him in the past, but not the same government officials. So what else did you need to add to that mix to demonstrate that there's a likelihood that he's going to be tortured again? He would need to show that he is being specific... His new theory that he needs to be specially... That he will be singly targeted out for torture. I mean, that's not enough to say that there were one or two or three instances of torture in the past. I can't speculate on what facts would be enough to prove that, but I can say that on this record, what the IJ found was... What he says is categorically the same people who tortured me in the past are going to have me in their grasp in the future. That maybe petitioners are going to... Maybe not the same specific individuals, but categorically. Public officials, law enforcement officials. He's going to be in their custody. And he's got the gang tattoos, so he's going to be identified. And he says based on that, it's highly likely I'm going to be tortured again. That is not what the immigration judge found. The immigration judge... Well, we know what the immigration judge found. I guess what I'm asking is... Just because the question was, what kind of facts would he need to show to demonstrate the likelihood that there's going to be torture? And I can understand you don't want to answer that, so I'm putting it a different way. What else would you add to all the facts he's already shown? What else would he need to add to get camp protection? If he could show that basically everyone in custody gets tortured, that would do it. But right now, he can't even show that more than 150 out of 70,000 detainees have been tortured, despite also all being gang members or suspected gang members. They have the same background. There's nothing particularly special about Petitioner's background that he's pointed to distinguish him from all the other 70,000 detainees. And not only that, he's had a record of situations where he's been detained and not faced torture. That is correct. That's the guy Jay found. Yes, Your Honor. Thank you. There are no more questions from Your Honors. And I would respectfully request that you deny the petition to review. Thank you. Thank you, counsel. Rebuttal. I would first like to address the Respondent's claim that Petitioner would have to show that more than everyone in custody has been targeted and tortured. That is not the standard of review. It is an individualized, forward-looking assessment. The integration judge is required to look at Mr. Ponce de Siena individually and determine whether he personally would be more likely than not tortured. So what do you contend personally makes him more likely to be tortured than any of the other gang members who are in the prison? First, I would like to note, as I previously stated, that not everyone that's being detained under the state of attachment is a gang member. There are multiple people. Fifty-four percent are considered collaborators. And as you see, many people are being released after being found that they're not gang members. So, can you repeat your question? I'm sorry, Your Honor. What would make him more likely to be tortured than any other gang member who's in the prison? I think the really important part of here is he was already singled out and specifically sought out. The officers were going to his home looking for him and threatening him specifically. And after he did that, they referred him, terrified. The threat that he received was that the next time they found him, they would kill him and that he was lucky that he always had family around. That is a direct threat to him specifically, not just any gang member. So that is what the immigration judge didn't engage with after he was in custody. And we have argued that Mr. Juan Despina brought this up in his asylum application in 1786 that he feared that he would be tortured because of the death threats and his past experiences. In his testimony in 1208, he indicated that he felt fear that he was going to be tortured because, quote, I've already lived it. Meaning the same things that were basis for his torture then would continue and under a worsening condition. It's very important to realize the state of exception has created a vehicle for him to be put into detention and tortured without any oversight. And that is what makes him different. He has this past torture and these past experiences. And again, as to specific intent, the immigration judge, even though the response was to claim that we didn't bring up the lack of oversight, the argument has been the same, that the judge didn't make a specific intent finding. So the lack of oversight was a consideration that the judge didn't engage with, as he didn't even engage with any of the evidence to make a specific intent finding, which is why remand is appropriate in this case. I'm sorry, I'm out of time. Thank you, counsel. We'll take this matter under advisement. This concludes the matter. Matters on today's docket will be on recess until tomorrow.